T.C. Memo. 1999-195


UNITED STATES TAX COURT


ELLA FREIDUS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 24197-97.                    Filed June 16, 1999.


On the facts, <u>Held</u>: R has established by clear and convincing evidence that at least part of F's underpayment for the taxable years 1987 and 1988 is attributable to fraud with the intent to evade tax and that F's failure to file her 1989 and 1990 tax returns is attributable to fraud. See secs. 6651(f), 6653(b), I.R.C.

<u>Held</u>, <u>further</u>, R's determination that F is liable for the additions to tax under sec. 6653(b)(1)(A) and (B), I.R.C., for the 1987 taxable year, sec. 6653(b)(1)(A), I.R.C., for the 1988 taxable year and sec. 6651(f), I.R.C., for the 1989 and 1990 taxable years is sustained.


<u>Richard H. Champion</u>, for petitioner.

<u>Monica E. Koch</u> and <u>Richard Wright</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NIMS, Judge: Respondent determined deficiencies, additions to tax, and penalties for 1987, 1988, 1989, and 1990 with respect to petitioner's Federal income taxes as follows:

| | | | Additions to Tax | | | |
|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1) | Sec. 6653(b)(1)(B) | Sec. 6654(a) | Sec. 6651(f) |
| 1987 | $100,446 | $75,335 | | $68,257 | $5,392 | |
| 1988 | 380,065 | | $285,049 | | 24,447 | |
| 1989 | 260,661 | | | | 17,628 | $195,496 |
| 1990 | 1,338,617 | | | | 87,642 | 1,003,963 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded to the nearest dollar.

The parties have agreed that the proper amounts of petitioner's income tax deficiencies are $31,554, $226,297, $42,521, and $835,656 for the 1987, 1988, 1989, and 1990 taxable years, respectively. The parties have further agreed that petitioner is liable for the addition to tax under section 6654(a) for the 1987, 1988, 1989, and 1990 taxable years.

After these concessions by both parties, the sole issue for decision is whether petitioner is liable for the additions to tax for fraud under section 6653(b)(1)(A) and (B) for the 1987 taxable year and section 6653(b)(1) for the 1988 taxable year and the additions to tax for fraudulent failure to file timely income tax returns under section 6651(f) for the taxable years 1989 and 1990. In the event we should determine that petitioner is not

liable for the additions to tax under sections 6651(f) and 6653(b), the parties have stipulated that petitioner would then be liable for the accuracy-related penalty attributable to negligence or disregard of rules or regulations under section 6662(a) for the 1987, 1988, 1989, and 1990 taxable years.

FINDINGS OF FACT

Petitioner resided in Cold Spring Harbor, New York, when the petition was filed. Petitioner is married to Jacob Freidus. Petitioner maintained separate finances from Mr. Freidus during the years in issue.

Prior to her marriage to Mr. Freidus in 1967, petitioner was an art dealer who collected art for an art gallery she owned on Long Island, New York. She was also an agent for a well-known Russian artist. During the operation of her art gallery, petitioner maintained books and records and filed tax returns.

Petitioner was a successful real estate investor and fine art collector. Petitioner engaged in several profitable real estate transactions prior to her marriage to Mr. Freidus. Upon petitioner's marriage to Mr. Freidus, petitioner received 7 properties from him.

Petitioner collected jewelry, antique rugs, and Picasso ceramics during the years in issue. Items in petitioner's art collection have often been displayed in museums throughout the world.

Prior to her marriage to Mr. Freidus, petitioner regularly filed Federal income tax returns. While petitioner was aware of her duty to file income tax returns and the consequences arising for failing to file, she did not file Federal income tax returns for her 1987, 1988, 1989, and 1990 taxable years. Petitioner was also aware of her right to request extensions to file her tax returns, but did not request extensions to file her returns. The last return petitioner filed was for the 1980 taxable year. Petitioner also knew of her obligation to make estimated tax payments, but failed to do so for the 1987, 1988, 1989, and 1990 taxable years.

Petitioner believed that a 1990 return, if prepared, would indicate that she owed taxes. Petitioner also believed that she would owe taxes for 1987 had a return been prepared.

During the years in issue, petitioner's income consisted of the following:

| Year | Horse Show Income | Interest | Capital Gains | Rents |
|------|-------------------|----------|---------------|-------|
| 1987 | $246,614 | $15,027 | $195,631 | $154,833 |
| 1988 | 104,166 | 15,427 | 903,018 | 127,943 |
| 1989 | 197,287 | 1,991 | 380,114 | 27,802 |
| 1990 | 133,578 | 7,489 | 3,179,663 | 9,184 |

Petitioner made the following purchases at Christie's auctions:

| Date | Amount |
|---|---|
| March 19, 1987 | $3,223 |
| March 20, 1987 | 3,300 |
| June 24, 1987 | 7,205 |
| October 1, 1987 | 3,520 |
| October 8, 1987 | 1,100 |
| November 12, 1987 | 4,653 |
| March 11, 1998 | 8,140 |
| April 9, 1988 | 1,760 |
| May 15, 1990 | 36,740 |
| May 15, 22, 30, 1990 | 213,950 |

Petitioner made the following purchases at Sotheby's auctions:

| Date | Amount |
|---|---|
| January 20, 1987 | $8,425 |
| January 30, 1987 | 2,860 |
| February 26, 1987 | 11,110 |
| May 13, 1987 | 1,650 |
| May 21, 1987 | 8,800 |
| June 23, 1987 | 10,230 |
| September 22, 1987 | 6,270 |
| October 6, 1987 | 715 |
| October 7, 1987 | 21,104 |
| November 11, 1987 | 17,930 |
| February 9, 1988 | 1,430 |
| February 24, 1988 | 11,000 |
| April 23, 1988 | 2,420 |
| May 30, 1990 | 24,130 |
| May 16, 1990 | 174,900 |

Petitioner paid the following amounts of qualified residence interest and property taxes for her residence at 40 Dock Hollow Road, Cold Spring Harbor, New York (Dock Hollow property):

| Year | Qualified Residence Interest | Real Property Taxes |
|---|---|---|
| 1987 | $140,502 | $15,000 |
| 1988 | 166,909 | 20,513 |
| 1989 | 50,000 | 40,262 |
| 1990 | 50,000 | |

Petitioner paid Annette Pores an annual salary of $8,000 for clerical services rendered for the taxable years 1987, 1988, 1989, and 1990.

Petitioner maintained records of her finances in an office located at the Dock Hollow property.

On or about September 1, 1988, the United States filed suit to collect the deficiencies determined by the Tax Court in Freidus v. Commissioner, T.C. Memo. 1979-507, in which Mr. Freidus was the petitioner. During 1989, the United States sought to depose Jacob Freidus and to examine documents in his possession that described his income and assets. Mr. Freidus resisted the efforts of the United States and the United States was forced to seek the District Court's assistance in conducting discovery. The United States also sought documents and deposition testimony from petitioner.

As a result of the District Court's order and subpoena issued to petitioner, three file cabinets and 43 boxes of records were transferred from her home and delivered to the office of her attorney beginning on February 23, 1990, at a rate of no more than two or three boxes per week. These records were copied and delivered to the United States, except for approximately 1,900 documents which petitioner claimed were privileged under the

Fifth Amendment, attorney-client privilege, and the work-product doctrine.  At no time was petitioner denied access to her records.

Subsequently, Mr. Freidus filed a petition under Chapter 7 of the Bankruptcy Code.  On October 1, 1991, the Bankruptcy Court entered an order directing that Mr. Freidus and petitioner be deposed and that they produce numerous documents with respect to their financial condition.  Petitioner's counsel advised the United States that petitioner would not submit to a deposition, invoking her rights under the Fifth Amendment; the United States did not depose petitioner.  The Bankruptcy Court denied Mr. Freidus a discharge of his Federal tax liabilities.  Mr. Freidus presently owes the Internal Revenue Service in excess of $21 million.

During the years in issue, petitioner traveled extensively. She flew to auction houses in London.  Petitioner and her husband traveled to Tokyo, Japan, in early April 1988, at the request of the Tokyo Metropolitan Art Museum to be present at the opening ceremony of an exhibition entitled "The 1920's in Japan". Petitioner also traveled to Russia and France to visit museums to which she had lent paintings.

Petitioner now resides in an 8,000 square-foot home on 20 acres, with an in-ground pool, 4 fireplaces, 715 feet of waterfront and a gazebo.  At the time of trial, the house was on

the market with an asking price of $3,950,000. The house, known as "Dark Hollow", has been described in the book The Mansions of Long Island, as "the most remarkable house on the east coast". Petitioner purchased this residence around 1967.

Petitioner employed a live-in married couple to take care of Dark Hollow during the years in issue. One of the caretakers, Johnny Mongkauw, also served as petitioner's chauffeur, whom Mr. Freidus paid in cash every week.

During the 1970s and 1980s, petitioner authorized or consented to the formation of multiple corporations. Subsequent to their formation, these corporations did not issue capital stock, transact business, hire employees, or file tax returns. Bank accounts were opened, and for a time maintained in the name of some of these corporations. These corporations were merely nominees; all income and expenses flowing therefrom were chargeable to petitioner. Petitioner often paid personal expenses from accounts in the names of her nominee corporations. Prior to her marriage to Mr. Freidus, petitioner had never incorporated her businesses.

Petitioner incorporated Ivory Ranch, Inc. (Ivory Ranch), a nominee corporation, on January 12, 1978, in the State of Nevada. Petitioner was its president and only officer. Ivory Ranch was subsequently reincorporated in the State of New York on July 22, 1985. Petitioner was its president and sole shareholder.

Ivory Land, Inc. (Ivory Land) was incorporated in the State of Nevada on August 6, 1986. Petitioner was its president, secretary, treasurer, and director. This corporation was a nominee corporation for petitioner.

An additional corporation, 77 Ivory Corp. (77 Ivory), was incorporated in the State of New York on April 21, 1976, and was a nominee corporation for petitioner.

Petitioner incorporated Ivory Tower Holding Corp. (Ivory Tower) in the State of New York on August 26, 1977. Ivory Tower was established as a holding company for all of petitioner's other companies and was a nominee corporation for petitioner.

Ivory Land, Ivory Ranch, 77 Ivory, and Ivory Tower did not file corporate Federal income tax returns for the years in issue.

During the years in issue, petitioner signed sale contracts, deeds, lease agreements, and numerous other related documents needed to complete her business transactions, and on some occasions authorized Mr. Freidus to sign them on her behalf.

Beginning in the 1970s, petitioner employed Edmund Burns (Burns) to handle her real estate matters. Petitioner subsequently made Burns her general counsel for all of her business transactions.

On a number of occasions, Burns received proceeds from the sales of petitioner's assets. Burns deposited these proceeds in his law firm's client escrow account, along with deposits from

other clients.  If these proceeds were to be held for a long time, Burns transferred the funds to an interest bearing account called the Pierpont Fund Money Market at Morgan Guaranty (Pierpont Account).  The money market account was held under the identification number of Burns' law firm, the fact of which petitioner was aware.  The account held only petitioner's funds and existed only for her benefit and her corporations' benefit.

With petitioner's consent, Burns disbursed money from her Pierpont Account and from her client escrow account to various third parties.  These disbursements were in partial satisfaction of petitioner's then existing business and personal liabilities. Only petitioner authorized disbursements from these accounts.

Burns furnished petitioner with Form 1099 each year for accrued interest from the Pierpont Account.  Petitioner earned interest in the amounts of $14,350, $13,637, $1,951, and $6,440 for the taxable years 1987, 1988, 1989, and 1990, respectively.

During the years in issue, an account in the name of Ivory Ranch was maintained at Chase Manhattan Bank (Chase).  Petitioner signed all of its disbursement checks.  Ivory Ranch's net deposits were as follows: $772,137, $780,254, $71,471, and $114,361 for the taxable years 1987, 1988, 1989, and 1990, respectively.  The checks petitioner drew upon this account were as follows: $13,900, $11,000, $1,500, and $9,120 for the taxable years, 1987, 1988, 1989, and 1990, respectively.

Ivory Land also maintained an account at Chase.  Its net deposits were as follows: $1,343,034, $647,998, $515,319 and $1,805,311 for the taxable years 1987, 1988, 1989, and 1990, respectively.  Petitioner drew checks upon this account in the following amounts: $80,875, $59,005, $52,116, and $59,850, respectively.

Petitioner maintained an account at Chase in her name during the years in issue.  Net deposits into this account were as follows: $138,698, $90,649, $21,419, and $150 for the taxable years 1987, 1988, 1989, and 1990, respectively.  At least $20,000 of transfers into petitioner's account is directly traceable to transfers from Ivory Land and Ivory Ranch.  Petitioner's account also received transfers of proceeds from petitioner's leases and horse-related activities in the following amounts: $88,092, $31,015, $8,122, and $8,700 for the taxable years 1987, 1988, 1989, and 1990, respectively.

Petitioner fully authorized Mr. Freidus to act as her agent during the years in issue.  Mr. Freidus, from time to time, requested that petitioner give him blank corporate checks affixed with petitioner's signature.  Petitioner regularly acceded to his requests.  Petitioner was aware of the expenditures and investments, which included investments in real estate and horses, which Mr. Freidus made on her behalf.  Petitioner knew what checks were being written and what they were used for.

Petitioner knew that Mr. Freidus was using the checks to make investments on her behalf. Petitioner hoped that Mr. Freidus would make good investments and earn profits. Petitioner would often discuss potential real estate investments with Mr. Freidus or Burns. If petitioner approved of a transaction, she signed all the necessary documents. Petitioner knew of Mr. Freidus' investment in horses but usually left the investment decisions to Mr. Freidus. When Mr. Freidus would sell or lease a farm or a horse as her agent, he discussed with petitioner the terms of the documents that she signed.

Petitioner owned 16 jumper horses during the years in issue. Petitioner's annual gross earnings from horse sales are as follows: $375,000 for a horse named Nimmedor in 1988; $45,000 for a horse named Urtola and $34,000 for a horse named Gold Falk in 1989; and $175,000 for a horse named Sebastian and $10,000 for a horse named Le Val Blanc in 1990. The purchaser of Nimmedor, Donna Furth, paid the $375,000 sale price by wire transfer to an Ivory Ranch account at Chase. The proceeds from the remaining horse sales were deposited into an account belonging to petitioner's broker and trainer, Margie Goldstein. The net income or loss from petitioner's horse-related activities were as follows: ($8,886), $216, $12,213, and ($17,171) for the taxable years 1987, 1988, 1989, and 1990, respectively.

On March 14, 1990, petitioner negotiated the sale of her 65-carat diamond, the Golden Maharajah. Petitioner had originally purchased the Golden Maharajah for $30,000, prior to her marriage to Mr. Freidus. She sold the Golden Maharajah for $1.3 million. Burns deposited the $1.3 million into his firm's client escrow account. He then paid $640,280 to various third parties, $555,000 of which was disbursed to the account of Ivory Land, and transferred $654,720 into petitioner's Pierpont Account. Mr. Freidus was not involved in the sale of the Golden Maharajah.

Petitioner sold 35 Picasso ceramic pieces on June 26, 1990, for $500,000. Burns deposited the $500,000 into his firm's client escrow account. Burns disbursed these funds in accordance with petitioner's instructions to various third parties, including Sotheby's, Phillips International Corporation, and Ivory Land. Mr. Freidus gave no directions regarding the sale of the Picasso ceramics or the distribution of the sale proceeds.

On December 27, 1990, petitioner sold 187 Picasso ceramic pieces for $1,943,330. Once again, the sale proceeds were deposited into the client escrow account of Burns' law firm. Petitioner directed Burns to deposit $1,000,000 into petitioner's Pierpont Account and to transfer $340,000 to Ivory Land and $546,000 to Sotheby's Financial Services.

Petitioner purchased a number of art works by using personal checks, charge cards, and loan proceeds from Sotheby's. The

costs of her art purchases were as follows: $89,094, $14,850, and $199,030 in the taxable years 1987, 1988, and 1990, respectively. In 1988 and 1989, petitioner borrowed a total of $635,069 from Sotheby's. Petitioner partially repaid these loans with the following amounts disbursed from the Ivory Land account: $48,953, $83,561, $25,843, and $73,074 in 1987, 1988, 1989, and 1990, respectively. Petitioner also used funds from the Ivory Land account to buy various art works from Christie's as follows: $16,535, $9,906, and $143,610 in 1987, 1988, and 1990, respectively.

Petitioner retained Eisner & Lubin on June 5, 1989, to prepare her and her corporate nominees' 1987 and 1988 tax returns. Eisner & Lubin made repeated requests for records and information to complete petitioner's individual and corporate tax returns. Petitioner failed to provide Eisner & Lubin with adequate records and documentation to prepare the returns for petitioner and her nominee corporations for the years in issue.

Petitioner did not timely pay Eisner & Lubin for services rendered in their attempt to prepare petitioner's income tax returns for the taxable years 1987 and 1988. Petitioner's delinquency in paying Eisner & Lubin for their services for the 1986 and prior taxable years had also been an ongoing problem. Petitioner received a letter from Eisner & Lubin dated October 21, 1987, stating that Eisner & Lubin had discontinued

preparation of her tax returns for the earlier years and would not resume work until fees in arrears had been satisfied and a retainer of $10,000 was paid. Payments totaling $80,236 were made during 1989 and 1990 to Eisner & Lubin for professional services. Eisner & Lubin performed an additional $40,000 worth of services for which petitioner was billed. Eisner & Lubin did not prepare any requests for extension or tax returns for petitioner or any of the nominee corporations for any year subsequent to 1980.

## OPINION

The sole issue for decision is whether petitioner is liable for the additions to tax for fraud under sections 6653(b)(1)(A) and (B) for the 1987 taxable year and section 6653(b)(1) for the 1988 taxable year and the additions to tax for fraudulent failure to file timely income tax returns under section 6651(f) for the 1989 and 1990 taxable years.

Section 6653(b)(1)(A) and section 6653(b)(1), as in effect, respectively, for the 1987 and 1988 returns in this case impose an addition to tax equal to 75 percent of the portion of the underpayment which is attributable to fraud. Section 6653(b)(1)(B), as in effect for 1987, imposes a further addition to tax equal to 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment attributable to fraud. If any portion of the underpayment is attributable to

fraud, then the entire amount of the underpayment is to be treated as attributable to fraud, except for any portion of the underpayment which the taxpayer establishes is not due to fraud. See sec. 6653(b)(2). In order for the additions to tax for fraud under section 6653(b) to apply, respondent must prove by clear and convincing evidence that an underpayment exists and that some portion of such underpayment is due to fraud. See sec. 7454(a); Rule 142(b); Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992).

Section 6651(a) imposes an addition to tax equal to 5 percent of the amount required to be shown on the return if a taxpayer fails to file within one month of the date prescribed. That section further imposes an additional 5 percent addition to tax for each month or fraction thereof during which such failure persists, not to exceed 25 percent in the aggregate. If any failure to file a return is fraudulent, section 6651(f) increases the additions to tax imposed under section 6651(a) to 15 percent of the net amount of tax due for each month that the return is not filed, up to a maximum of 75 percent. In this case, respondent must prove under section 6651(f) that petitioner's tax liability for 1989 and 1990 exceeds her prepayment credits and that her failure to file for each taxable year was an attempt to evade tax. See secs. 7454, 6651(a)(1), (b)(1), (f); Rule 142(b). To determine whether petitioner's failure to file her return was

fraudulent, we apply the same elements used when considering the imposition of the addition to tax for fraud under former section 6653(b)(1) and present section 6663(a). See Clayton v. Commissioner, 102 T.C. 632, 653 (1994).

The parties have stipulated that petitioner's income tax deficiencies are $31,554, $226,297, $42,521, and $835,656 for the 1987, 1988, 1989, and 1990 taxable years, respectively. On the record before us, we hold that respondent has established by clear and convincing evidence that petitioner has an underpayment for each of the years 1987 and 1988, and has a tax liability exceeding her prepayment credits for each of the taxable years 1989 and 1990.

To prove fraudulent intent, respondent must prove by clear and convincing evidence that the taxpayer intended to evade taxes that were believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. See Recklitis v. Commissioner, 91 T.C. 874, 909 (1988). Tax evasion need not be a primary motive, but respondent may satisfy his burden by showing that a "'tax-evasion motive play[ed] any part' in petitioner's conduct". Id. Respondent must establish fraud for each taxable year involved by clear and convincing evidence. See Otsuki v. Commissioner, 53 T.C. 96, 105 (1969).

The existence of fraud is a question of fact to be resolved upon examination of the entire record. See Parks v.

Commissioner, 94 T.C. 654, 660 (1990); Recklitis v. Commissioner, supra at 909. Fraud is never presumed but must be established by independent evidence. See Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Otsuki v. Commissioner, supra at 105. Fraud may be proven by circumstantial evidence because direct evidence of the taxpayer's intent is rarely available. See Recklitis v. Commissioner, supra at 909; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

Circumstantial evidence of fraud includes: (1) Consistent and substantial understatement of income, (2) failure to maintain adequate records, (3) failure to file tax returns, (4) inconsistent or implausible explanations of behavior, (5) concealing assets, and (6) failure to cooperate with tax authorities. See Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Other badges of fraud include the failure to make estimated tax payments, extensive dealings in cash, see Recklitis v. Commissioner, supra at 910; the awareness of the obligation to file returns, report income and pay taxes, see Schiff v. United States, 919 F.2d 830, 833 (2d Cir. 1990); and failure to provide tax return preparers with complete and accurate information, see Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th Cir. 1986), affg. T.C. Memo. 1985-63.

In this case, petitioner has willfully failed to file timely tax returns for the 1987, 1988, 1989, and 1990 taxable years;

petitioner was fully aware of her obligation to file tax returns. Petitioner failed to maintain adequate records of her income-producing activities. The parties have stipulated that petitioner, an experienced and sophisticated businessperson who maintained books and records for her art business and had regularly filed tax returns in the past, failed to provide Eisner & Lubin with complete and accurate records for the taxable years 1987 and 1988, despite repeated insistence that she do so.

In addition, petitioner rather cavalierly failed to timely pay her accountants, Eisner & Lubin, for their return preparation services for the 1987 and 1988 taxable years, an ongoing problem; petitioner's failure to pay effectively prevented preparation of petitioner's tax returns for these years. Petitioner had adequate funds in her Pierpont Account and in the accounts of her nominee corporations to pay Eisner & Lubin. Petitioner knew that Eisner & Lubin would cease tax return preparation until petitioner satisfied fees in arrears and paid a $10,000 retainer as Eisner & Lubin's October 21, 1987, letter indicated. Burns, on behalf of petitioner, finally paid Eisner & Lubin in 1989. The fact that petitioner had sufficient funds to pay Eisner & Lubin and knew that Eisner & Lubin would cease work until paid, further suggests a willful failure to file her 1987 and 1988 returns.

Petitioner's failure to file her returns for the years 1987, 1988, 1989, and 1990, establishes a 4-year pattern of substantial and consistent understatements of income.

Petitioner's explanations for her failure to file tax returns and provide her accountants with complete and accurate information are contradicted by the record. Petitioner asserts that her failure to file was caused by the subpoena issued to her in the collection action against Mr. Freidus which interrupted the process of gathering information to submit her returns. Therefore, petitioner maintains that her ultimate failure to file was caused by the disruption attendant to the collection action and not by an intent to defraud the government.

We disagree. The record indicates that petitioner began producing documents in response to the subpoena on February 23, 1990. Since her 1987 and 1988 returns were due prior to this date, the subpoena could not have caused a disruption in preparation of these tax returns. Furthermore, the parties have stipulated that at no time was petitioner denied access to her records and that petitioner had custody of all original documents. Therefore, petitioner's failure to file her tax returns cannot be attributed to the collection action against Mr. Freidus. Petitioner's implausible explanation is a badge of fraud.

Petitioner further argues that Mr. Freidus frustrated her attempts to file by failing to produce necessary documents for her tax return preparers.  Petitioner testified as follows:

Q:   Can you tell us why no return was filed in 1987?

A:   Well, I went -- I did hire three different -- and they all got money, but somehow it just never got done because Mr. Freidus frustrated them, didn't come up with --

Q:   And can you explain what you mean by that?

A:   Well, he didn't come up with the things that were necessary.  He kept them.  And for me, it was very difficult to start to go up the steps where they were kept in the files.

Petitioner further asserts that Mr. Freidus had overwhelming control over finances and was abusive, impeding her attempts to file her returns.  Mr. Freidus testified that he had custody and control over petitioner's financial documents located at Dark Hollow.

However, the evidence fails to establish that Mr. Freidus substantially impeded petitioner's attempts to file her tax returns.  Mr. Freidus never denied petitioner access to her financial documents.  He never advised petitioner not to file her tax returns.  He never threatened petitioner with physical harm if she filed her tax returns.

According to petitioner's testimony, it was too difficult for her to climb the steps to get her files.  Even if we were to accept petitioner's excuse, she could have easily requested her

secretary, Annette Pores, or petitioner's caretaker, Johnny Mongkauw, to fetch relevant records. Furthermore, petitioner has not presented evidence that Mr. Freidus' behavior prevented petitioner from requesting extensions to file her tax returns. Since petitioner knew that she had the right to file requests for extensions to file her returns, she must have deliberately chosen not to request the extensions. Therefore, petitioner has failed to establish that Mr. Freidus prevented her from timely filing her tax returns.

The failure to make estimated tax payments supports a finding of fraud. See Bradford v. Commissioner, 796 F.2d at 308. Petitioner deliberately and consistently failed to pay estimated taxes for all 4 years in issue as evidenced by the fact that petitioner was fully aware of her obligation to estimate her tax liability and make estimated tax payments.

Concealing assets coupled with a failure to file tax returns is a strong indication of fraud. Using her secret Pierpont Account, accounts of third parties, and nominee corporations, petitioner employed a strategy designed to conceal assets from potential creditors, including respondent. Assets in the Pierpont Account consisted mainly of proceeds from petitioner's income-producing activities. The record shows that petitioner arranged to have the sale proceeds from the Golden Maharajah diamond and Picasso ceramics wired into the Pierpont Accounts.

The funds were then disbursed per petitioner's instructions to various third parties, including petitioner's nominee corporations. Assets in the Pierpont Account would be difficult to trace to petitioner because the account was held under the identification number of Burns' law firm. We agree with Burns' testimony at trial that the Pierpont Account effectively hid petitioner's assets from potential creditors, including respondent.

Petitioner asserts that a purpose of the Pierpont Account was to protect petitioner's assets from the consequences of voluntarily giving Mr. Freidus blank signed checks drawn upon her corporate bank accounts. The record, however, shows behavior inconsistent with petitioner's alleged purpose. Petitioner testified that she knew what checks were being written and what they were used for. Petitioner knew that Mr. Freidus was using the checks to make investments on her behalf. Petitioner hoped that Mr. Freidus would make good investments and earn profits. Petitioner would often discuss potential real estate investments with Mr. Freidus or Burns. If petitioner approved of a transaction, she signed all necessary documents. Petitioner knew of Mr. Freidus' investment in horses, but she usually left the investment decisions to him. If petitioner truly needed protection, she could easily have canceled the checks or closed the corporate accounts. She certainly would not have given Mr.

Freidus authority to invest on her behalf or have approved transactions entered into on her behalf had she not wished him to do so. Overall, petitioner did not behave like a person needing protection from the spending habits of her husband.

Moreover, a substantial amount of proceeds from the sale of the Golden Maharaja diamond and the sale of Picasso ceramics that were wired into the Pierpont Account were disbursed to petitioner's corporate accounts. For instance, petitioner disbursed $555,000 to Ivory Land upon the sale of the Golden Maharaja in March 1990. Petitioner also disbursed a total of $223,125 to Ivory Land upon the sale of the 35 Picasso ceramics in June of 1990. On December 27, 1990, when petitioner sold 187 Picasso ceramic pieces for $1,943,330, petitioner directed Burns to transfer $340,000 to the Ivory Land account. Transferring these amounts from the safety of the secret Pierpont Accounts into the Ivory Land corporate account exposed the transferred amounts to the blank corporate checks in Mr. Freidus' possession and is therefore inconsistent with petitioner's stated purpose of hiding assets from Mr. Freidus.

Due to petitioner's inconsistent behavior, we conclude that protection from the consequences of voluntarily giving Mr. Freidus blank signed checks drawn upon her corporate bank accounts was not a purpose of the Pierpont Account. We further conclude that petitioner's inconsistent and implausible

explanations of behavior are a badge of fraud. Petitioner notes on brief that the Pierpont Account was needed to prevent Mr. Freidus from making unauthorized purchases on petitioner's behalf at art auctions. However, this self-serving assertion is not supported by the record.

Petitioner's use of nominee corporations is further evidence of asset concealment. See Jones v. Commissioner, T.C. Memo. 1994-230, affd. without published opinion 68 F.3d 460 (4th Cir. 1995) (finding that a taxpayer's use of alter ego corporations to conduct personal as well as business transactions was evidence of asset concealment). The record shows that the corporate accounts were mere repositories for proceeds derived from petitioner's income producing activities. In addition to proceeds from sales of her Golden Maharajah Diamond and Picasso Ceramics which were deposited into the Ivory Land account, petitioner also deposited proceeds from horse sales into the Ivory Ranch account. Since petitioner's nominee corporations did not file returns, tracing and attributing income to petitioner would be severely impeded.

Petitioner argues that the corporations were formed solely to hold title to real property and to insulate her from personal liability. Once again, petitioner's assertion is contradicted by the record. The parties have stipulated that the corporate accounts were used to pay petitioner's personal expenses. Petitioner also used corporate funds to invest in fine art and to

harbor proceeds from income producing activities. As noted above, petitioner partially repaid loans from Sotheby's with substantial amounts disbursed from the Ivory Land account. Petitioner also used funds from the Ivory Land account to buy various art pieces from Christie's. Like the Pierpont Account, we think petitioner used her corporate nominees to conceal assets.

Further evidence of asset concealment is the fact that petitioner deposited proceeds from horse sales into an account belonging to petitioner's broker and trainer, Margie Goldstein, once again making it difficult for respondent to trace these proceeds to petitioner.

Petitioner argues that her entire course of conduct fails to demonstrate that the deficiencies were due to an intent to evade taxes, citing Stoltzfus v. United States, 398 F.2d 1002 (3d Cir. 1968), and Nelon v. Commissioner, T.C. Memo. 1997-49, for support. Instead of supporting petitioner's position, Stoltzfus v. United States, supra, reinforces respondent's position. In that case, the Court affirmed the judgment of the District Court denying the taxpayer's request for a refund of civil fraud penalties imposed pursuant to section 6653(b) of the 1954 Code. The taxpayer had failed to file returns from 1943 through 1958. Like petitioner, the taxpayer had extensive business experience, a keen awareness of financial matters and was aware of his duty

to file returns, report income, and pay taxes.  See id. at 1005.
The taxpayer's total gross income for his 1954 taxable year
dictated the inference that he knew he owed taxes for that year.
In the case before us no inference is necessary because
petitioner herself testified that had she prepared and filed tax
returns for the 1987 and 1990 taxable years, she would have owed
taxes.

Furthermore, Nelon v. Commissioner, supra, is
distinguishable.  In that case, the taxpayer, a high school
dropout and inexperienced in bookkeeping and financial matters,
operated a logging business as a sole proprietorship.  The
taxpayer's income from his logging business could easily be
traced from the Forms 1099 supplied by payers.  The taxpayer
joined a tax protester group and did not file tax returns under
the belief that he was not subject to Federal income tax.  The
Commissioner asserted that the taxpayer was liable for the
addition to tax for fraud, contending that the following facts
established fraud: (1) Failure to file tax returns for 5
consecutive years; (2) consistent failure to report substantial
amounts of income; (3) failure to maintain books and records of
his logging business; (4) failure to pay estimated taxes; and (5)
cashing, rather than depositing, checks derived from his logging
business.  We held that the Commissioner did not clearly and
convincingly establish that the taxpayer's underpayment was due

to fraud.  We stated that the record did not "show any affirmative acts of concealment or misrepresentation so as to constitute fraud, such as filing false information or attempting to mislead respondent."  Id.

Unlike the taxpayer in Nelon v. Commissioner, supra, petitioner is an astute businessperson possessing adequate skill in maintaining adequate books and records.  Furthermore, petitioner acknowledges that she is under an obligation to file returns and pay Federal income taxes.  Petitioner's income is not easy to trace, but rather difficult to establish due to her surreptitious use of secret accounts and nominee corporations. Therefore, unlike Nelon v. Commissioner, supra, the record here contains ample evidence of affirmative acts of concealment so as to constitute fraud.

Overall, in her extended testimony before us, petitioner impressed us as being a strong-minded businesswoman fully capable of managing her affairs, including the filing of accurate and timely tax returns.

Based on the foregoing, we hold that respondent has established by clear and convincing evidence that at least part of petitioner's underpayment for the taxable years 1987 and 1988 is attributable to fraud with the intent to evade tax.  We further hold that petitioner's failure to file her 1989 and 1990 tax returns is attributable to fraud because petitioner's failure

to file was essential to her clandestine concealment of assets and various sources of income related thereto.   Accordingly, respondent's determination that petitioner is liable for the additions to tax under section 6653(b)(1)(A) and (B) for the 1987 taxable year, section 6653(b)(1) for the 1988 taxable year, and section 6651(f) for the 1989 and 1990 taxable years is sustained.

To reflect the foregoing,

<u>Decision will be</u>

<u>entered under Rule 155</u>.